## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WARNER VALLEY FARM, LLC, | : | No. 4:21-CV-01079 |
| | : | |
| Plaintiff, | : | Chief Judge Brann |
| | : | |
| *vs.* | : | [Filed by ECF] |
| | : | |
| SWN PRODUCTION COMPANY, | : | |
| LLC, | : | |
| | : | |
| Defendant. | : | |

## BRIEF IN SUPPORT OF MOTION OF
## DEFENDANT SWN PRODUCTION COMPANY, LLC,
## FOR PARTIAL SUMMARY JUDGMENT

**K&L GATES LLP**
David R. Fine
Market Square Plaza
17 North Second Street, 18th Floor
Harrisburg, PA  17101
(717) 231-4500
david.fine@klgates.com

*Counsel for Defendant SWN Production Company, LLC*

# TABLE OF CONTENTS

Introduction.................................................................................................1

Factual and Procedural Background........................................................3

Issue Presented ......................................................................................... 8

Law and Discussion ................................................................................. 8

I.   There is no basis for a facial challenge to Act 85...........................10

   A.  Act 85 does not cause across-the-board contract impairment.......................10

   B.  Even if Act 85 caused some impairment, the General Assembly's significant and legitimate legislative purposes justify it. .................................... 13

II.  There is no basis for an as-applied challenge to Act 85...................14

   A.  There is no evidence that Act 85 has impaired the Warner lease.................14

   B.  Even if Act 85 caused some impairment to Warner's lease rights, the General Assembly's significant and legitimate legislative purposes justify it. .................16

Conclusion................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*City of L. A. v. Patel*,
  576 U.S. 409 (2015) ...................................................................10, 13

*Energy Reserves Group, Inc. v. Kansas Power & Light Co.*,
  459 U.S. 400 (1983) ............................................................. 9, 11, 13

*South Union Twp. v. Cmwlth, Dep't of Envtl. Prot.*,
  839 A.2d 1179 (Pa. Cmwlth. 2003) ...........................................8, 9, 13

*United States v. Marcavage*,
  609 F.3d 264 (3d Cir. 2010) ..............................................................10

*United States v. Salerno*,
  481 U.S. 739 (1987) ...........................................................................10

*Watters v. Bd. of Sch. Dirs. of Scranton*,
  975 F.3d 406 (3d Cir. 2020) ........................................................ 9, 14

*Zito Media, L.P. v. Haggerty*,
  320 F. Supp.3d 630 (M.D. Pa. 2018) (Brann, J.)................................8

**Statutes**

58 P.S. § 34.2 ....................................................................................3, 4, 11

28 U.S.C. § 1331 ........................................................................................7

28 U.S.C. § 1332(a)....................................................................................7

**Other Authorities**

Senate Co-Sponsorship Memorandum dated March 5, 2019, from
  Sen. Gene Yaw to All Senate Members Regarding "Reducing
  Surface Impact from Unconventional Gas Wells" ............................5

Pennsylvania Constitution Article I, § 17 .................................................8

United States Constitution Article I, § 10 .............................................................8

## INTRODUCTION

In this motion, Defendant SWN Production Company, LLC ("SWN"), seeks summary judgment on a vaguely articulated and factually unsupported claim by Plaintiff Warner Valley Farm, LLC ("Warner"), that an enactment by the Pennsylvania General Assembly violates the Contracts Clauses of the federal and Pennsylvania Constitutions.

As the Court is no doubt aware from the oil-and-gas cases it has presided over, oil-and-gas producers in the Marcellus Shale (and elsewhere) generally enter into leases with landowners that allow the producers to drill wells on the landowners' properties and produce oil or gas from beneath those properties. For a variety of reasons, as in this case, producers and landowners frequently agree that the producers may create drilling "units" comprised of more than one leased property. In those cases, it is customary that, if a horizontal well is drilled on any property in the unit, the production from that well and the resulting royalties will be allocated among the properties in the unit.

In 2019, the Pennsylvania General Assembly enacted and Governor Wolf signed Act 85 of 2019. The statute confirms that a producer that has leases with landowners in adjoining drilling units may drill a cross-unit wellbore unless a landowner's lease prohibits it and so long as production from the cross-unit wellbore is reasonably allocated among the units the wellbore traverses. In enacting Act 85, the General Assembly sought to benefit a number of stakeholders, including landowners like Warner. For example, because a cross-unit wellbore allows more production from a single well pad, such a wellbore can and generally does decrease

the number of well pads constructed, the number of gathering lines from well pads to interstate pipelines, the number of access roads to and from well pads and the amount of vehicle traffic on roads and highways in Pennsylvania. In addition, the ability to drill cross-unit wellbores can make it economically feasible for a producer to drill in an area in which it would not otherwise make sense if the wellbore were limited to a single property or a single unit.

SWN (and others) are parties to a lease with Warner. That lease, which created in SWN a property interest, grants SWN a host of rights, like the ability combine a lessor's property with others to create productions units (both contiguous and non-contiguous) and to modify the size and shape of any such units. The lease likewise allowed SWN to produce from any unit it created. In accordance with that lease, SWN has drilled cross-unit wellbores through units that include the Warner property, and SWN has paid Warner (and Warner has accepted) all royalties due from these cross-unit wells.

Despite accepting the royalties from these cross-unit wells, Warner alleges among other things that SWN should not have been permitted to drill the cross-unit wellbores because, in Warner's estimation, Act 85 is an unconstitutional impairment of contract.

Warner does not clearly identify whether its challenge to the statute is facial or as-applied, but it does not matter since the challenge is baseless in either event. For the statute to be facially unconstitutional, it would have to violate the Contracts Clauses in all circumstances, and it does not. Indeed, there are a great many circumstances—including this case—in which Act 85 has benefited landowners or,

2

at the very least, not impaired landowners' rights. And even if there were some modest impairment, the General Assembly's significant and legitimate public purposes more than justify the purported impairment.

For the statute to be subject to an as-applied challenge, Warner would have to demonstrate that its interests have been impaired. But Warner has asserted simply that its lease has been affected in some regards, an allegation that might be true but that is insufficient. Warner has agreed that the time is ripe to test its claim against the summary-judgment standard, but it has yet to offer any evidence that its lease rights have been impaired by, say, a diminution in royalties as a result of the cross-unit drilling. Indeed, as demonstrated below, without the ability to drill cross-unit wellbores, it would not have been economically feasible for SWN to develop the units of which Warner's property is a part. Thus, Act 85, confirming as it did SWN's ability to drill cross-unit wells, allowed Warner to earn royalties when it would otherwise not have.

SWN asks the Court to grant this motion and enter summary judgment on Warner's constitutional challenge to Act 85.

## FACTUAL AND PROCEDURAL BACKGROUND

### Factual Background

#### *Act 85*

In 2019, the Pennsylvania General Assembly adopted and the Governor approved Act 85 of 2019, which amended Pennsylvania's Oil and Gas Lease Act. Oil and Gas Lease Act—Cross Unit Drilling for Unconventional Wells, Act of Nov. 7, 2019, P.L. 634, No. 85; codified at 58 P.S. § 34.2. Act 85 addresses "cross-unit"

drilling of unconventional wells, and it confirms that a producer may drill a horizontal wellbore that traverses more than one unit so long as certain conditions are met. Specifically, Act 85 provides as follows:

> (a) General rule.—If an operator has the right to drill an oil or gas well on separate units, the operator may drill and produce a well that traverses, by horizontal drilling, more than one unit, if:
>
> > (1) The operator reasonably allocates production from the well to or among each unit the operator reasonably determines to be attributable to each unit. The operator may allocate production on an acreage basis for multiple units provided the allocation has a reasonable correlation to the portion of the horizontal wellbore in each unit.
> >
> > (2) The traversing well is not expressly prohibited by the terms of a lease.

58 P.S. § 34.2. In enacting Act 85, the General Assembly had a number of goals, including the following:

> a.    reducing surface disturbance by decreasing the number of wells drilled and well pads constructed;
>
> b.    decreasing the number of gathering lines necessary to transport natural gas from well pads to interstate pipelines;
>
> c.    decreasing the number of access roads necessary for access to and from well pads; and
>
> d.    decreasing the amount of truck traffic.

*See* Senate Co-Sponsorship Memorandum dated March 5, 2019, from Sen. Gene Yaw to All Senate Members Regarding "Reducing Surface Impact from Unconventional Gas Wells" ("Co-Sponsorship Memo").[1]

### The Warner Claim

On April 12, 2006, Wayne W. Warner and Reba Warner (as lessors) and Fortuna Energy, Inc. (as lessee), entered into an oil-and-gas lease, a copy of which is attached to the complaint (the "Complaint") at Exhibit "A." *See* Complaint, Exhibit A (ECF No. 1-1); *see also* Complaint, ¶ 3; Answer of Defendant SWN Production Company, LLC ("Answer"), ¶ 3.[2]

The Warner lease covers 506.46 acres of property in Pike and Stevens Townships, Bradford County, Pennsylvania (the "Leasehold"). *See* Complaint, ¶ 4. Warner is a successor-lessee-in-interest to the lease. *See* Complaint, Exhibit B; *see also* Complaint, ¶5. SWN is a successor-lessee-in-interest to some of the interests conveyed by the lease. *See* Complaint, Exhibit C; *see also* Complaint, ¶ 6.[3]

---

[1] For the Court's convenience, the Co-Sponsorship Memo is attached at Tab "A."

[2] SWN cites the Complaint for a number of these statements, but it does not concede that all of the factual allegations in the Complaint are accurate. It cites them because, even if the facts were as Warner portrays them, SWN would be entitled to summary judgment on Count III's constitutional claim.

[3] Repsol Oil & Gas USA, LLC ("Repsol"), which has filed a motion to intervene in this case, also has an interest in the Warner lease. It is not clear why Warner did not join Repsol at the outset. Warner has not opposed Repsol's intervention motion, which remains pending.

The lease includes a number of relevant provisions. For example, in its leasing clause, the lease grants to the lessees exclusive right to drill and produce from Warner's property using techniques "not restricted to current technology." Complaint, Exhibit A, ¶ 1. The lease allows the lessees broad rights to exercise its sole discretion to include Warner's property in a unit (or units). Complaint, Exhibit A, ¶ 12. The lease allows properties to be unitized with one another even if they are not contiguous. *Id.* The lease allows SWN (or any other lessee) the right to change the size, shape and conditions of any unit created under the lease. *Id.*

As expressly permitted in the lease, the Warner lease is unitized with other properties to form a number of drilling units. *See* Complaint, ¶ 7; *see also* Answer, ¶ 7. SWN created two of those drilling units: Campbell Ercole Demento North and Chamberlin Meyer North (the "SWN Production Units"). *See* Complaint, ¶ 8; *see also* Answer, ¶ 8.

Before SWN began development in the units that include the Warner property, SWN's reservoir engineer reviewed the area and determined that the likely production from any of the units standing alone would not be sufficient to justify the capital expenditure to drill separate wells on each unit.[4] Thus, SWN determined that the only economically viable way to develop those units would be by means of cross-unit wellbores.[5] Development using cross-unit wellbores is more efficient and cost-effective since it allows the producer to construct just one well pad and drill just one

---

[4] Declaration of Michael K. Bishop at ¶ 6. The Bishop declaration is attached at Tab "B."

[5] *Id.* at ¶¶ 7, 8.

vertical wellbore rather than having separate well pads and vertical wellbores on each unit.[6] Simply stated, without the ability to drill a cross-unit wellbore, SWN would not have developed wells on the units of which Warner's property is a part.[7]

Accordingly, gas wells in the SWN Production Units include cross-unit wellbores (the "Cross-Unit Wells"). *See* Complaint, ¶¶ 10–11; *see also* Answer, ¶¶ 10–11. SWN is the operator of the Cross-Unit Wells. *See* Complaint, ¶ 12; *see also* Answer, ¶ 12. SWN pays Warner royalties pursuant to the lease for production from the Cross-Unit Wells. *See* Complaint, ¶¶ 13–14; *see also* Answer, ¶¶ 13–14. There is no well on the Warner property itself.

**Procedural Background**

Warner filed its Complaint in the Court of Common Pleas of Bradford County, Pennsylvania, on May 14, 2021. By notice of June 18, 2021, SWN removed the case to this Court because there was complete diversity of citizenship, 28 U.S.C. § 1332(a), and because there was a federal question presented, 28 U.S.C. § 1331. Specifically, in addition to breach-of-contract claims, Warner alleges that Act 85 violates the prohibitions on contractual impairment in the federal and Pennsylvania Constitutions.

After completing significant discovery, the parties agreed that discovery was materially complete with respect to Warner's claim that Act 85 of 2019 is unconstitutional. Accordingly, by motion dated May 17, 2022, the parties jointly requested that the Court allow them to file motions for partial summary judgment

---

[6] *Id.* at ¶ 9.

[7] *Id.* at ¶ 8.

focused on Count III of the Complaint—which makes the constitutional challenge—and that the Court stay the remaining case-management deadlines. By order of May 19, 2022, the Court granted the joint motion. Under the May 19, 2022, order, the motions were to be filed within 30 days. On June 21, 2022, the Court granted a joint motion for an extension of time and allowed the parties until July 18, 2022, to file any motions for partial summary judgment.

On July 18, 2022, the parties filed cross-motions for partial summary judgment on Count III of the Complaint, which alleges that Act 85 is unconstitutional.

## ISSUE PRESENTED

Whether Act 85 of 2019 violates the Contracts Clauses of the federal or Pennsylvania Constitutions facially or as applied to Warner's lease.

*[Suggested answer: No.]*

## LAW AND DISCUSSION

Warner alleges that Act 85 is unconstitutional because it purportedly impairs existing contracts and, so, allegedly runs afoul of the Contracts Clauses in Article I, § 10 of the United States Constitution and Article I, § 17 of the Pennsylvania Constitution.[8] Warner is mistaken.

The analyses under the federal and Pennsylvania Constitutions are materially similar. *See South Union Twp. v. Cmwlth, Dep't of Envtl. Prot.*, 839 A.2d 1179 (Pa.

---

[8] Summary judgment is appropriate when there are no genuine issues of material facts and the movant is entitled to judgment as a matter of law. *Zito Media, L.P. v. Haggerty*, 320 F. Supp.3d 630, 632 (M.D. Pa. 2018) (Brann, J.).

Cmwlth. 2003). That analysis focuses on three issues: (1) whether there is a contractual relationship; (2) whether a change in law impairs that contractual relationship; and (3) whether any impairment is substantial. *Id*.

The Supreme Court has held that, in determining the extent of any alleged impairment, courts should consider if the contract is within an industry that has been regulated in the past. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983). A party that enters into an agreement in a regulated industry is assumed to do so subject to further legislation in that industry. *Id*. Moreover, "state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment." *Id*.

While the language of the Contracts Clauses of the federal and Pennsylvania Constitutions appears absolute, courts have held that the prohibitions in those clauses "must be accommodated to the inherent police power of the State to safeguard the vital interests of its people." *Energy Reserves Group*, 459 U.S. at 410; *Watters v. Bd. of Sch. Dirs. of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020). Accordingly, if an impairment is found, the court must then consider whether the change in the law is justified by a significant and legitimate public purpose such as remedying a broad and general social or economic problem. *South Union Twp.*, 839 A.2d at 1188-89; *Energy Reserves Group*, 459 U.S. at 410. Importantly, if the law impairs a contract between private parties, the state is ordinarily entitled to deference in its legislative judgment. *Watters*, 975 F.3d at 414.

"A facial challenge to a legislative [a]ct is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of

circumstances exists under which the [a]ct would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987) (emphasis added). An as-applied challenge, on the other hand, focuses on the application of the statute to the facts of a particular case. *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010). A principal difference between the two types of challenges is the scope of the remedy: if a plaintiff can satisfy the very demanding standard for a facial challenge, the court may invalidate the statute generally; if a plaintiff can satisfy the standard for an as-applied challenge, the court may hold that the statute may not be applied to the specific case presented by the plaintiff but leave the statute otherwise in place. *Id.*

Warner does not indicate in its Complaint whether it makes a facial or an as-applied challenge. SWN will address both possibilities to demonstrate that neither has merit.

## I.    There is no basis for a facial challenge to Act 85.

As noted above, the contract-impairment analysis broadly asks if there is an impairment and, if there is, whether there is a significant and legitimate state interest to justify it.

### A.    *Act 85 does not cause across-the-board contract impairment.*

Any facial challenge to Act 85 fails at the first step. To succeed on a facial challenge, "a plaintiff must establish that a 'law is unconstitutional in all of its applications.'" *City of L. A. v. Patel*, 576 U.S. 409, 418 (2015) (*quoting Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008)).

Nothing in the text of Act 85 serves inherently to impair any and all leases subject to it; indeed, there is no evidence it impairs any lease. The statute merely

confirms that an operator may drill and produce from cross-unit wells *so long as* the lease does not expressly preclude cross-unit wells; the operator "reasonably allocates production from the well to or among each unit the operator reasonably determines to be attributable to each unit"; and "[t]he operator may allocate production on an acreage basis for multiple units provided the allocation has a reasonable correlation to the portion of the wellbore in each unit." 58 P.S. § 34.2. None of those provisions is intrinsically detrimental to the rights of any party to an oil-and-gas lease—indeed, as discussed below, those provisions are broadly beneficial. They make clear that natural gas may be produced in many circumstances in which it would otherwise not be economically viable and, in any event, there is no evidence that Warner or any other lessor has received or will receive less than they reasonably expected to receive from their leases, particularly since any party entering into an oil-and-gas lease in Pennsylvania can be presumed to know that Pennsylvania significantly regulates the industry and periodically enacts new statutes and regulations that affect leases. *Energy Reserves Group*, 459 U.S. at 411.

Consider just a few illustrations.

First, imagine that Landowner owns property that is leased to Producer, and Producer has created Unit X that includes Landowner's property. Producer also has created Unit Y, which is adjacent to Unit X and includes the same number of acres, but does not include Landowner's property. Producer constructs a well pad on Unit Y and from that well pad drills a horizontal well that traverses equal distances through each of Unit Y and Unit X. Act 85 would confirm that Producer may construct the cross-unit wellbore and then to allocate production equally between

11

the two units. In that situation, Landowner would be paid a royalty based on his allocated share of the production, but he would not have to have a well pad on or near his property and he would not need to have gathering lines or increased truck traffic near his home. Without Act 85, the well pad on Unit Y could potentially be the starting point only for a horizontal wellbore that extends no further than the boundaries of Unit Y, and Landowner would receive no production allocation and, therefore, no royalty. Act 85 worked to Landowner's benefit and, so, there could be no impairment.

Second, consider a similar illustration except that Producer constructs a well pad on Unit X (the same one Landowner's property is in). The benefits to Landowner from the cross-unit wellbore would be the same as in the previous illustration. Unlike in the previous illustration, in this illustration Landowner would be entitled to a royalty based on his share of production from Unit X even if Act 85 were not in effect and there was no cross-unit wellbore traversing Unit Y. But there is no reason to presume that Landowner would have a greater allocation of production, and therefore, a greater royalty, from a Unit-X-only situation than in a cross-unit situation. While it might be the case that the production in a cross-unit situation would be allocated among a greater number of landowners (since the "pool" would include landowners from both units), there would likely be greater overall production since the wellbore would be longer and pulling from two units instead of one. Indeed, Act 85 aims to avoid a disparity since it suggests it is permissible to allocate production to included units in proportion to acreage—which is generally the means for allocation among properties within units.

Third, consider a circumstance in which engineering and financial circumstances would make it impractical or unreasonable for Producer to drill and produce from a well solely within the particular unit in which Landowner's property is located. If engineering and financial considerations would, however, allow that unit to be included in a cross-unit drilling project, Landowner would likely be able to benefit by receiving royalties from the cross-unit situation when he would have received no royalties otherwise. (That scenario is hardly speculative. As SWN notes above and below, the facts regarding the Warner property track this scenario.)

The bottom line is this: there are a number of ways in which Act 85 works to the benefit of landowners like Warner, in addition to the many circumstances in which landowners will be no worse off than if their production were wholly within single units. Thus, it cannot be said that Act 85 law "is unconstitutional in all of its applications." *Patel*, 576 U.S. at 418 (quotation omitted).

### B.    *Even if Act 85 caused some impairment, the General Assembly's significant and legitimate legislative purposes justify it.*

There is no impairment but, even if there were, the General Assembly had significant and legitimate purposes that more than justify Act 85. *South Union Twp.*, 839 A.2d at 1188-89; *Energy Reserves Group*, 459 U.S. at 410.

While the legislative history of Act 85 is not extensive, the Co-Sponsorship Memo sets out just some of the purposes for the statute. The General Assembly sought, among other things, to reduce surface disturbance by decreasing the number of wells drilled and well pads constructed; to decrease the number of gathering lines necessary to transport natural gas from well pads to interstate pipelines; to decrease

13

the number of access roads necessary for access to and from well pads; and to decrease the amount of truck traffic on the Commonwealth's roads and highways. *See* Co-Sponsorship Memo. Those goals benefit essentially all parties to oil-and-gas production, including landowners (who benefit from production) and other members of the public who avoid having traffic, construction and drilling near their properties.

Moreover, as the Third Circuit recently reiterated, if a law is alleged to impair a contract between private parties, the state is ordinarily entitled to deference in its legislative judgment. *Watters*, 975 F.3d at 414. Thus, the Court should defer to the General Assembly's judgment in balancing those societal benefits with any purported contract impairments.

\*\*\*

There is no merit to any facial challenge to Act 85 based on the Contracts Clauses of the federal and Pennsylvania Constitutions. The statute does not broadly and materially impair oil-and-gas leases and, even if it caused *some* impairment, the General Assembly had significant and legitimate justifications that warrant this Court's deference.

## II.     There is no basis for an as-applied challenge to Act 85.

### A.     *There is no evidence that Act 85 has impaired the Warner lease.*

There is then the question of whether Act 85 as applied in the circumstances of this case unconstitutionally impairs the Warner lease. It does not.

Warner's first assertion is that its lease is impaired because, under Act 85, the Warner property can be included in a cross-unit gathering of properties when the lease does not expressly permit that. *See* Complaint at ¶ 53.[9]

Nothing in Act 85 impairs any term in the Warner lease. The statute expressly disallows cross-unit drilling if a lease precludes it. The Warner lease has no such term. Instead, it grants to the lessees (including SWN) broad rights to develop the oil-and-gas resources beneath the Warner property, including through unitization and use of new technologies. And that is what SWN has done.

Warner then contends that Act 85 impairs its lease "because the agreed-to contractual text regarding unitization/pooling and royalties is wholly re-written by the law, which materially affects the benefit of the bargain in the contract for the Plaintiff." *See* Complaint at ¶ 54.

While SWN adamantly disputes that Act 85 "wholly" rewrote any part of the Warner lease, the bottom line, again, is that Warner does not allege and cannot prove that Act 85 has *impaired* its rights under the lease. The constitutional prohibition is against statutory impairment of contracts, not merely statutory effects on contracts. Notably, Warner does not allege in its Complaint, in its own motion for partial summary judgment or in its statement of undisputed material facts in support of its motion that the drilling and production from these cross-unit wells of which Warner is a part have lessened Warner's allocation of natural gas and resulting royalties.

---

[9] SWN does not concede that Act 85 was necessary for it to drill cross-unit wellbores. The lease language can reasonably be read to allow such a technique without statutory permission.

And, as SWN demonstrates in an earlier section of this brief, there are a number of ways in which cross-unit wellbores can and do benefit landowners—not only with respect to royalty payments but with respect to the sorts of benefits the General Assembly sought such as avoidance of unnecessary surface disturbance, well pads, gathering lines, access roads and traffic.

Recall the development history SWN recounted above. Before drilling, SWN determined that it would not be economically viable for it to drill wells on each unit of which the Warner property is a part and that the only reasonable means for SWN to develop those units would be with a cross-unit wellbore. That development history underscores that Act 85 did not impair Warner's contract rights. Indeed, without Act 85 and SWN's willingness to drill a cross-unit wellbore, Warner would have had no production allocated to it with respect to these wells and, of course, no royalties. Thus, rather than impairing the contract, the cross-unit well is what economically enabled the contracted development and payment of royalties. As the proponent of its as-applied constitutional challenge, Warner bears the burden of proving that Act 85 has in fact impaired its lease rights. It cannot do so.

**B.    *Even if Act 85 caused some impairment to Warner's lease rights, the General Assembly's significant and legitimate legislative purposes justify it.***

There is no evidence that Warner's lease rights have been impaired by Act 85. Even if there were some impairment, the General Assembly's legislative judgment is entitled to deference on judicial review. The General Assembly weighed the value of increased economic development while also limiting the negative public costs

(such as increased traffic) from additional well pads. Deference to this considered legislative judgment for the public more than justifies any modest impairment. As discussed above, those legislative purposes serve to benefit the public broadly, including landowners like Warner.

***

As a matter of law, Warner cannot prevail on an as-applied challenge to Act 85 based on the Contracts Clauses. There is no evidence that Warner's lease rights have been impaired and, even if there were some modest impairment, the General Assembly's legislative goals justify that impairment.

**CONCLUSION**

SWN Production Company, LLC, respectfully requests that the Court grant its motion and enter summary judgment in its favor and against Plaintiff on Count III of the Complaint.

Respectfully submitted,

**K&L GATES LLP**

/s/ David R. Fine
David R. Fine
Market Square Plaza
17 North Second Street, 18th Floor
Harrisburg, PA  17101
(717) 231-4500
david.fine@klgates.com

*Counsel for Defendant SWN Production Company, LLC*

August 8, 2022

18

**CERTIFICATE REGARDING WORD COUNT**

I certify that this brief includes 4,391 words as calculated using the word-counting feature of Microsoft Word.

<u>/s/ David R. Fine</u>

**CERTIFICATE OF SERVICE**

I certify that, on August 8, 2022, I filed the attached document with the Court's CM/ECF system such that the following should receive service automatically:

Robert J. Burnett, Esq.
Brendan A. O'Donnell, Esq.
Houston Harbaugh, P.C.
401 Liberty Avenue
Three Gateway Center, 22nd Floor
Pittsburgh, PA 15222

<u>/s/ David R. Fine</u>